United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 24, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-11069

_____

MARCH MADNESS ATHLETIC ASSOCIATION LLC

       Plaintiff - Counter Defendant - Third Party Plaintiff -
       Appellee - Cross Appellant

versus

NETFIRE INC, a Texas Corporation, dba Sports Marketing
International Inc; SPORTS MARKETING INTERNATIONAL INC

       Defendants - Counter Claimants - Third Party Defendants
       - Appellants - Cross Appellees

MATTHEW JONES

       Third Party Defendant - Appellant - Cross Appellee

versus

ILLINOIS HIGH SCHOOL ASSOCIATION, an Illinois Assocation

       Counter Defendant - Appellee

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

       Counter Defendant - Appellee - Cross Appellant

---------------------
Appeals from the United States District Court
for the Northern District of Texas, Dallas
3:00-CV-398-R
---------------------

Before REAVLEY, BENAVIDES, and PRADO, Circuit Judges.

1

PER CURIAM:[*]

## I.  INTRODUCTION

This dispute centers on competing claims to the domain name marchmadness.com.  The Appellants/Cross-Appellees in this case are Netfire, Inc. ("Netfire"), Sports Marketing International, Inc. ("SMI") and Matthew Jones ("Jones") (collectively the "SMI Parties").  The Appellees are the March Madness Athletic Association ("MMAA"), the National Collegiate Athletic Association ("NCAA") and the Illinois High School Association ("IHSA").  MMAA and NCAA are also Cross-Appellants, while IHSA has withdrawn its cross-appeals.

In February 2000, IHSA sued Netfire for trademark infringement, dilution and unfair competition under the Lanham Act and Texas state law.  MMAA later replaced IHSA as the plaintiff in the case, and amended its complaint to add a claim for cybersquatting, in violation of 15 U.S.C. § 1125.

SMI filed counterclaims for fraud, tortious interference with contract and with business relations, and civil conspiracy.  Finally, the SMI Parties amended their counterclaims to add a claim for conversion against IHSA and claims for fraud and civil conspiracy against IHSA and NCAA.

The district court, in orders on August 15, 2001 and June 4,

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

2002, granted IHSA and NCAA's motion for summary judgment on SMI's counterclaims. The district court denied the remaining motions for summary judgment filed by the parties, and the case proceeded to a bench trial.

On August 28, 2003, the district court issued its Findings of Fact and Conclusions of Law in favor of MMAA on its infringement and cybersquatting claims, and against MMAA on its civil conspiracy claim. The district court transferred ownership of the domain name marchmadness.com to MMAA, and it required the SMI Parties to pay the costs of the district court action. The district court did not, however, require the SMI Parties to pay MMAA's attorneys' fees, nor did it find the SMI Parties liable for any damages.

The SMI Parties appeal the district court's findings that March Madness is a protectable mark and that a likelihood of confusion exists between March Madness and marchmadness.com. The SMI Parties also appeal the district court's grant of summary judgment in favor of the NCAA and IHSA on SMI's counterclaims.

MMAA and NCAA appeal the following findings by the district court: that March Madness was not an inherently distinctive mark, that the SMI Parties did not engage in a civil conspiracy, that SMI was not liable for the acts of Jones and Netfire, that MMAA was not entitled to damages and that MMAA was not entitled to attorneys' fees.

For the reasons below, we affirm in all respects.

3

## II. STATEMENT OF FACTS

### A. History of marchmadness.com

Dirk and Phil Brinkerhoff ("Dirk" and "Phil") are brothers who together formed SMI. Matthew Jones is Phil's son-in-law and the founder of Netfire.[1] In December 1995 or January 1996, Dirk and Jones discussed obtaining the domain name marchmadness.com so that SMI could use it to develop a website focused on the NCAA Division I Men's Basketball Championship (the "NCAA Tournament"). Jones told Dirk that the domain name was available, so Dirk instructed Jones to acquire it.

In fact, an individual named Adam Stein ("Stein") had registered marchmadness.com in late 1995 before Jones could do so. As an alternative, Jones registered the domain name march-madness.com.

Jones, acting on behalf of Netfire, and without the knowledge of the Brinkerhoffs or SMI, contacted Stein in early 1996. Jones told Stein that Netfire was affiliated with the NCAA and that Netfire was the rightful owner of marchmadness.com, neither of which was true. On February 7, 1996, Jones and Stein executed an agreement transferring marchmadness.com to Netfire in exchange for a $25,000 advertising credit on Netfire websites, the rights to the domain name march-madness.com and a link from

---

[1] Jones is an experienced cybersquatter. He registered for many other domain names including stairmaster.com, gucci.com and windows98.com.

marchmadness.com to march-madness.com.

The SMI Parties immediately began to develop content for marchmadness.com.  All of the content related to the NCAA Tournament.[2]

The NCAA sent SMI a cease and desist letter on February 5, 1996 asserting its trademark rights.  The letter stated: "The name of the project [marchmadness.com], in the context in which your client is using it, infringes on the NCAA's common law mark 'March Madness.'"  In response, SMI decided not to operate the website for the March 1996 NCAA Tournament.

IHSA sent a cease and desist letter to SMI on October 14, 1996.  The letter stated that IHSA was the "owner of all rights to the trademark March Madness, including Federal Trademark Registration No. 1,571,340."

Despite the letters from the NCAA and IHSA, SMI decided to continue development of the site.  The website was operational from sometime in 1997 until July 1999.[3]

In 1998, IHSA requested that Network Solutions, Inc. ("NSI"), the entity that controls the domain registration process, place marchmadness.com on hold, which would pull the

---

[2] Dirk Brinkerhoff testified that marchmadness.com was not intended to be a commercial site and that SMI had a long-term plan for it to cover a wide range of sports, as opposed to only covering the NCAA Tournament.  However, the district court found his testimony "unpersuasive" and "entirely without credibility."

[3] Due to a server malfunction, the site was not available for a few months in 1998.

domain name out of circulation. NSI did so in late June 1999. However, in January 2000, NSI notified IHSA that it had changed its hold policy, and that IHSA would have to submit court documents related to SMI by February 23, 2000 in order to preserve the hold. Accordingly, IHSA filed this suit on February 22, 2000.

### B. History of "March Madness"

IHSA has organized an annual boys' high school basketball tournament in Illinois since 1908. Since the 1940s, IHSA has used the term "March Madness" to refer to the IHSA Tournament.

IHSA first attempted to register March Madness in 1990. At that time it discovered that an entity called Intersport had registered the phrase on December 12, 1989. Intersport's registration was for "entertainment services, namely, presentation of athletic and entertainment personalities in a panel forum" regarding the NCAA Tournament. IHSA and Intersport eventually came to an agreement, on July 24, 1995, whereby Intersport assigned its registered service mark to IHSA in return for a perpetual license to use March Madness for its sports programming and a share of royalty payments received by IHSA.

IHSA claimed exclusive rights to March Madness, and it licensed the phrase for any use, even uses that did not relate to the IHSA Tournament. Its commercial licensees included Wilson Sporting Goods, Pepsi and the *Chicago Tribune*. IHSA also

licensed March Madness to other state high school associations for the nominal fee of $10.

The NCAA's first use of the phrase "March Madness" is generally traced to 1982, when CBS broadcaster Brent Musberger used the phrase to describe the NCAA Tournament.[4]  The NCAA began licensing March Madness in 1988 as one of a set of marks relating to NCAA championships.

### C. Trademark Dispute Between IHSA and NCAA

In the early 1990s, both IHSA and NCAA were claiming exclusive rights to all commercial uses of March Madness.  In 1996, IHSA sued an NCAA licensee, GTE Vantage, that created a basketball video game that made use of the phrase March Madness. In December 1996, the Seventh Circuit, in *Illinois High School Ass'n v. GTE Vantage*, rejected IHSA's claim to rights over March Madness in the context of the NCAA Tournament.  99 F.3d 244, 247–48 (7th Cir. 1996).

Following the Seventh Circuit decision in *GTE Vantage*, IHSA and NCAA decided to work together to protect their rights in March Madness.  After several years of negotiation, IHSA and NCAA formed MMAA on February 29, 2000, one week after the instant case was filed by IHSA.  IHSA and NCAA each transferred all rights it held in March Madness to MMAA, and in return each received a

---

[4] CBS was the licensed television broadcaster for the NCAA Tournament at the time.

7

license to use the term in relation to its basketball tournament.

As of August 2003, MMAA held seven registered service marks or trademarks for March Madness, an additional five for America's Original March Madness and another for March Madness Experience.

### III. Discussion

After considering the record and the parties' arguments in their briefs and at oral argument, we affirm the district court for the following reasons:

With respect to the district court's finding that "March Madness" is a descriptive mark which has acquired secondary meaning - a question of fact that we review for clear error - we find no clear error. *See, e.g.*, *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11, 13 (5th Cir. 1974).

With respect to the district court's finding that marchmadness.com created a likelihood of confusion with "March Madness" - a question of fact that we review for clear error - we find no clear error. *See, e.g., Elvis Presley Enters. v. Capece*, 141 F.3d 188, 196 (5th Cir. 1998).

With respect to the district court's determination that the registration and use of marchmadness.com by SMI, Netfire and Jones violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"),[5] we find no error. Whether they profited or not, SMI, Netfire and Jones acted with the bad faith intent to profit as

---

[5] 15 U.S.C. § 1125(d).

required by 15 U.S.C. § 1125(d)(1)(A)(i), and the domain name marchmadness.com is identical or confusingly similar to the term March Madness as required by § 1125(d)(1)(A)(ii).

With respect to the district court's determination that MMAA was not entitled to damages under the ACPA as a result of the violation by SMI, Netfire and Jones, we find no error because damages under the ACPA are not available for domain registration and/or use that occurred prior to the ACPA's enactment on November 29, 1999, and the registration and use of marchmadness.com by the SMI Parties occurred before that date. *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 277 (5th Cir. 2002); 1999 Acts, P.L. 106-113, § 3010, 113 Stat. 1536.

With respect to the district court's grant of MMAA's motion for summary judgment on the SMI Parties' counterclaims, we find no error. We note that we may affirm the district court if summary judgment "is sustainable on any legal ground in the record" and that summary judgment "may be affirmed on grounds rejected or not stated by the district court." *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 537-38 (5th Cir. 2003)(internal citations omitted). Because we have affirmed the district court's determination that March Madness is a protectable trademark, all of the SMI Parties' counterclaims necessarily fail because they all depend on a finding that March Madness is a generic term.

9

With respect to the district court's determination that Jones and Netfire made false representations in violation of 15 U.S.C. § 1125(a), we find no error. Section 1125(a) prohibits, *inter alia*, the use of any false or misleading representation of fact that is likely to cause confusion or to deceive as to the affiliation, connection or association of a person with another person. Jones falsely represented to Adam Stein, the original owner of the domain name marchmadness.com, that he was affiliated with the NCAA.

With respect to the district court's determination that the SMI Parties were not liable for civil conspiracy, we find no error. Under Texas law, a civil conspiracy requires: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). The district court determined that MMAA failed to prove, by a preponderance of the evidence, that the SMI Parties had a shared intent to harm Stein. There was no meeting of the minds because there was no evidence that Jones told anyone that he was going to obtain the domain name from Stein, rather than from NSI. We agree.

With respect to the district court's determination that SMI was not vicariously liable for Jones's misrepresentations to

10

Stein regarding an affiliation with the NCAA, we find no error. Furthermore, even if we did find error it would be harmless error because a finding that SMI was vicariously liable for Jones's misrepresentations would not in any way alter the damage award in this case.

With respect to the district court's determination that MMAA was not entitled to attorneys' fees, we find no clear error. Pursuant to 15 U.S.C. § 1117(a), a court may award attorneys' fees to the prevailing party in "exceptional cases." An "exceptional case" under the Lanham Act is one "where the violative acts can be characterized as malicious, fraudulent, deliberate, or willful." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 555 (5th Cir. 1998)(quoting *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1390 (5th Cir. 1996)). The prevailing party must demonstrate the exceptional nature of a case by clear and convincing evidence. *Id*. Lack of damages is an important factor in determining whether a case is exceptional. *Id*. (citing *Texas Pig Stands, Inc. v. Hard Rock Café Int'l*, *Inc.*, 951 F.2d 684, 697 n.23 (5th Cir. 1992)). "We review the district court's findings as to whether a case is exceptional for clear error and its decision on whether to award attorneys' fees for an abuse of discretion." *Id*.

We agree with the district court that the question of whether to award attorneys' fees in the instant case is a close

11

call.  Given the district court's reasons for not awarding attorneys' fees, including the fact that as of early 1996, when the SMI Parties acquired marchmadness.com, the trademark rights of IHSA and NCAA were not readily apparent and the fact that MMAA did not prove any damages, as well as the requirement that MMAA establish the exceptional nature of this case by clear and convincing evidence, we find that the district court did not abuse its discretion by declining to award attorneys' fees to MMAA.

With respect to the district court's determination that MMAA was not entitled to damages as a result of the SMI Parties' violations of 15 U.S.C. §§ 1125(a) and (d) for false representations and trademark infringement, we find no error. The SMI Parties never profited from the operation of marchmadness.com, nor did MMAA present sufficient evidence that it sustained damages as a result of the SMI Parties operating marchmadness.com.

## IV.  Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.