THIS OPINION IS A
PRECEDENT OF THE TTAB

Remand Hearing:
June 22, 2016

Mailed:
September 6, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Frito-Lay North America, Inc.*
*v.*
*Princeton Vanguard, LLC*
_____

Opposition No. 91195552
Cancellation No. 92053001
On Remand
_____

William G. Barber and Paul Madrid of Pirkey Barber PLLC, for Frito-Lay North America, Inc.

David H. Bernstein and Neelima Teerdhala of Debevoise & Plimpton LLP, for Princeton Vanguard, LLC.
_____

Before Cataldo, Taylor and Ritchie, Administrative Trademark Judges.

Opinion by Ritchie, Administrative Trademark Judge:

Princeton Vanguard, LLC ("Defendant") owns a registration on the Supplemental

Register for PRETZEL CRISPS, in standard character format, for "pretzel crackers,"

in International Class 30,[1] disclaiming the exclusive right to use the term "PRETZEL" apart from the mark as shown, which registration was granted on July 26, 2005. Defendant later filed an application to register PRETZEL CRISPS,[2] in standard character format, for "pretzel crackers," in International Class 30 on the Principal Register, disclaiming the exclusive right to use the term "PRETZEL" apart from the mark as shown, and claiming acquired distinctiveness in the mark as a whole under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f).

On July 2, 2010, Frito-Lay North America, Inc. ("Plaintiff") filed an opposition to the registration of the proposed mark in Application Serial No. 76700802 on the ground that when used in connection with "pretzel crackers," the term "PRETZEL CRISPS" is generic and, in the alternative, that PRETZEL CRISPS is highly descriptive and has not acquired distinctiveness. On September 10, 2010, Plaintiff filed a petition to cancel Supplemental Register Registration No. 2980303 on essentially the same grounds.[3] Defendant denied the salient allegations in both cases. The cases were consolidated.[4] As discussed below, summary judgment motions were

---

[1] Registration No. 2980303 issued from Serial No. 78405596, filed April 21, 2004 and based on dates of first use and first use in commerce of October 2004. Section 8 Affidavit accepted. Renewed.

[2] Serial No. 76700802, filed December 11, 2009, based on dates of first use and first use in commerce on October 6, 2004.

[3] Applications for registration on the Supplemental Register cannot be the subject of claims of Section 2(f) acquired distinctiveness. Thus, there is no issue regarding acquired distinctiveness in the Cancellation proceeding.

[4] The two cases were originally consolidated with another proceeding, Opposition No. 91190246 to Serial No. 77192054, which was the parent case for these proceedings. However, on May 10, 2011, the parties stipulated to voluntarily dismiss that case without prejudice

2

filed by each party, and the parties agreed, pursuant to stipulation, to proceed to trial based on the evidence presented with these motions, as well as supplemental expert declarations.

On February 28, 2014, the Board issued a decision granting the cancellation of Registration No. 2980303 and sustaining the opposition to Application No. 76700802, on the ground that Defendant's asserted mark PRETZEL CRISPS as used in connection with "pretzel crackers," is generic. *Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC,* 109 USPQ2d 1949 (TTAB 2014). On appeal, the Court of Appeals for the Federal Circuit determined that the Board had used an incorrect legal standard. *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.,* 786 F.3d 960, 114 USPQ2d 1827 (Fed. Cir. 2015). The Court vacated and remanded the decision for further proceedings. The Court directed, among other things, that the Board "give appropriate consideration to the proffered survey evidence." *Id.* at 1834. As such, our analysis and conclusion on remand follows.

<u>The Record and Evidentiary Issues</u>

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of Application Serial No. 76700802 and Registration No. 2980303. The parties stipulated that they could rely on the materials submitted in support of and against each party's aforementioned motion for summary judgment and that therefore evidence may be submitted through declarations, including one

---

and for defendant to abandon that application. Therefore, the remaining opposition became the parent case.

additional declaration filed by each of the four experts disclosed in the case.[5] The parties agreed to waive any objections to the admissibility of "previously submitted evidence." *Id.* On remand, we ordered the parties to rebrief the case, on the original record.

The parties submitted the evidence listed below.

A.      Plaintiff's testimony and evidence, with attached exhibits.

1.      Declaration of Pam Forbus, Plaintiff's Vice-President of Strategic Insights, dated September 8, 2010;

2.      Declaration of Paul Madrid, counsel for Plaintiff, dated June 14, 2012;

3.      Declarations of Eric R. Olson, a legal assistant employed by Plaintiff's counsel, dated September 8 and December 9, 2010;

4.      Declaration of Katrina Ripperda, a paralegal employed by counsel for Plaintiff, dated September 9, 2010;

5.      Declaration of Dr. Ivan Ross, expert employed by Plaintiff, dated June 11, 2012;

6.      Declarations of Dr. Alex Simonson, expert employed by Plaintiff, dated June 13 and October 24, 2012.

B.      Defendant's testimony and evidence, with attached exhibits.

1.      Declarations of Warren Wilson, Defendant's Manager and co-founder,

---

[5] 91195552 48 TTABVUE 2.

and President of Snack Factory, Inc., an affiliate of Defendant and exclusive licensee to use Defendant's marks,[6] dated May 8, 2012, November 18, 2010, and June 27, 2010;[7]

2.      Declaration of Perry Abbenante, Vice-President of Marketing for Snack Factory, Inc., dated May 8, 2012;

3.      Declaration of Ryan Scott Mellon, counsel for Defendant, dated May 8, 2012;

4.      Declarations of Christopher Lauzau, Senior Legal Research Associate employed by Defendant's counsel, dated May 8, 2012 and November 16, 2010;

5.      Declaration of John O'Donnell, Principal at JP Food Sales, Inc., dated November 1, 2010;

6.      Declaration of Gary Plutchok, President of Happy Herman's Food Company, Inc., d/b/a Snacktree International and Jetway Snacks LLC, dated November 1, 2010;

7.      Declaration of Salvatore D'Agostino, Business Manager of World Wide Sales, dated November 2, 2010;

8.      Declaration of Mark Finocchio, Principal of Pinnacle Food Sales, dated November 1, 2010;

9.      Declarations of Dr. George Mantis, expert employed by Defendant, dated June 27 and November 2, 2012;

---

[6] 91195552 37 TTABVUE 3.

[7] The latter were included in 91190246.

5

10.    Declarations of Dr. E. Deborah Jay, expert employed by Defendant, dated November 18, 2010, and May 2 and November 1, 2012.

### Standing

"The facts regarding standing … are part of [a plaintiff's] case and must be affirmatively proved. Accordingly, [plaintiff] is not entitled to standing solely because of the allegations in its petition." *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). To prove its standing to oppose the registration of an allegedly generic term, a plaintiff may show it is engaged in the manufacture or sale of the same or related goods as those listed in the defendant's application or registration; that is, that plaintiff has the right to use the term in a descriptive or generic manner. *Nature's Way v. Nature's Herbs*, 9 USPQ2d 2077, 2080 (TTAB 1989); *Ferro Corp. v. SCM Corp.*, 219 USPQ 346, 352 (TTAB 1983). *See also Binney & Smith Inc. v. Magic Marker Industries, Inc.*, 222 USPQ 1003, 1010 (TTAB 1984). Defendant does not contest Plaintiff's standing.[8] Furthermore, inasmuch as the evidence of record shows that Plaintiff sells pretzels, crackers, and other snack foods, Plaintiff has established its standing.[9]

### Genericness

There is a two-part test used to determine whether a proposed mark is generic: (1) what is the genus of goods at issue? and (2) does the relevant public understand the designation primarily to refer to that genus of goods? *H. Marvin Ginn Corp. v.*

---

[8] 91195552 7 TTABVUE 2.

[9] 91195552 49 TTABVUE 95-96.

*Int'l Assn. of Fire Chiefs, Inc.*, 782 F.2d 987, 990, 228 USPQ 528, 530 (Fed. Cir. 1986); *see also Princeton Vanguard,* 114 USPQ2d at 1830. The public's perception is the primary consideration in determining whether a term is generic. *Id.* Evidence of the public's understanding of a term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers and other publications. *Id.,* citing *In re Northland Aluminum Products, Inc.,* 777 F.2d 1556, 1559, 227 USPQ 961 (Fed. Cir. 1985). It is plaintiff's burden to establish that PRETZEL CRISPS is generic by a preponderance of the evidence. *Princeton Vanguard,* 114 USPQ2d at 1830 at n. 2.

There is no dispute that the category of goods here is adequately defined by defendant's identification of goods in the application and subject registration, "pretzel crackers." *Id.* at 1830; *See also Magic Wand Inc. v. RDB, Inc.,* 940 F.2d 638, 19 USPQ2d 1551, 1552 (Fed. Cir. 1991) ("[A] proper genericness inquiry focuses on the description of [goods or] services set forth in the [application or] certificate of registration.").

The second part of the genericness test is whether the relevant public understands the designation primarily to refer to that class of goods. The relevant public for a genericness determination is the purchasing or consuming public for the identified goods. *Magic Wand,* 19 USPQ2d at 1553. Because there are no restrictions or limitations to the channels of trade or classes of consumers for pretzel crackers, the

relevant consuming public comprises ordinary consumers who purchase and eat pretzel crackers.[10] We consider and analyze the evidence in this case.

A. Evidence of Meaning of Terms "Pretzel" and "Crisps"

To determine the public perception of the term "PRETZEL CRISPS" as it applies to "pretzel crackers," we must analyze the meaning of the applied-for mark "as a whole." *See Princeton Vanguard,* 114 USPQ2d at 1831, citing *In re Steelbuilding.com,* 415 F.3d 1293, 1297, 75 USPQ2d 1420, 1421 (Fed. Cir. 2005). In doing so, the Federal Circuit, our primary reviewing court, has noted that it may be appropriate "as a first step" to analyze the constituent terms in the applied-for mark. *Id.* at 1833; *see also 1800Mattress.com IP*, 586 F.3d 1359, 92 USPQ2d 1682, 1684 (explaining that the Board appropriately considered the separate meanings of "mattress" and ".com" when determining that the combination "mattress.com" was generic); *In re Hotels.com LP,* 573 F.3d 1300, 1304, 91 USPQ2d 1532, 1535 (Fed. Cir. 2009) (affirming the Board's finding that "the composite term HOTELS.COM communicates no more than the common meanings of the individual components").

In analyzing the constituent terms "PRETZEL" and "CRISPS," we consider the meaning of each to the consuming public as indicated by dictionary definitions and other competent sources. *See Northland,* 227 USPQ at 963. Defendant submitted a definition of "pretzel" as "A glazed brittle biscuit that is salted on the outside and usu.

---

[10] The Board made these findings as to the genus and relevant public in the February 14, 2014 decision. As stated by the Federal Circuit, "[n]either party disputes these findings on appeal." *Princeton Vanguard,* 114 USPQ2d at 1830.

baked in the form of a loose knot or a stick."[11] Defendant's Manager and co-founder, Warren Wilson, further defines the "PRETZEL CRISPS" product as being a form of pretzel: "PRETZEL CRISPS crackers possess a unique shape, based on removing the middle slice from a traditional pretzel design. Exhibit 1 (picture of a PRETZEL CRISP)", as shown:[12]



Finally, Defendant's original identification of goods for Application Serial No. 78405596, as filed on April 21, 2004, stated simply "pretzels." After receiving an office action on November 15, 2004 refusing its applied-for mark as generic, Defendant submitted an amendment to the identification on May 11, 2005 re-characterizing the goods as "pretzel crackers." The Trademark Rules state that an "applicant may

---

[11] 91195552 36 TTABVUE 345. The American Heritage College Dictionary (3rd ed. 1997). We take judicial notice that the 5th ed. 2017 provides the same definition. The Board may take judicial notice of dictionary definitions, including definitions or entries from references that are the electronic equivalent of a print reference work. *See Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.,* 213 USPQ 594, (TTAB 1982) *aff'd,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983) (dictionary definitions); *In re Red Bull GmbH,* 78 USPQ2d 1375, 1377 (TTAB 2006) (online dictionaries that exist in printed format or regular fixed editions).
[12] 91195552 37 TTABVUE 4 (Exhibit 1, at 20).

amend the application to clarify or limit, but not to broaden, the identification of goods and/or services . . ." Trademark Rule 2.71; 37 CFR § 2.71. Because the amendment to its identification was found to be acceptable, we can conclude that Defendant's identified "pretzel crackers" is a subcategory of the broader product category "pretzel."

As to the term "CRISP," Defendant and Plaintiff, respectively, submitted dictionary definitions of the term as meaning, in relevant part, "(*noun*) Something crisp or brittle;"[13] and "(*noun*) Something crisp or easily crumpled."[14]

Plaintiff's witness, Pam Forbus, testified that the "generic term 'crisp' or 'crisps'" has been used by Plaintiff and others to identify their snack food items "since at least as early as 1959."[15] Such products include Munchos potato crisps, Baked Lay's and Baked Ruffles potato crisps, Stacy's soy crisps, TRUENORTH nut crisps and FLAT EARTH fruit crisps and veggie crisps. *Id.* Applicant itself previously used the term

---

[13] 91195552 36 TTABVUE 352. Merriam-Webster's Collegiate Dictionary (11th ed. 2004).

[14] 91195552 47 TTABVUE 275. The American Heritage College Dictionary (4th ed.2002).

[15] 91195552 49 TTABVUE 96. We note that both Plaintiff and Defendant submitted copies of third party registrations containing the term "CRISPS," some with and some without disclaimers. It is axiomatic that we are not bound by the Office's determination in other cases. And these third-party registrations are not particularly probative in our analysis. *See In re Cordua Restaurants, Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016) ("The PTO is required to examine all trademark applications for compliance with each and every eligibility requirement . . . ."); *In re Shinnecock Smoke Shop*, 571 F.3d 1171, 1174, 91 USPQ2d 1218, 1221 (Fed. Cir. 2009) ("Even if all of the third-party registrations should have been refused registration . . . , such errors do not bind the USPTO to improperly register Applicant's marks.") (citation omitted); *In re Nett Designs, Inc.,* 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to Nett Designs' application, the PTO's allowance of such prior registrations does not bind the Board or this court.").

"CRISPS" in the nutrition facts labels displayed on its "PRETZEL CRISPS" product

to refer to its pretzel crackers, as shown below:[16]



We further refer to the following admissions by Defendant:

---

[16] 91195552 40 TTABVUE 205.

11

Request for Admission No. 24: [17]
Admit that "crisps" can be used as a term for the product that is the subject of the Application.

Response:
Subject to the foregoing General Objections, Princeton Vanguard admits this request.

Request for Admission No. 25:
Admit that Applicant's packages for its PRETZEL CRISPS products provide nutrition facts for a serving size of a stated number of "crisps."

Response:
Subject to the foregoing General Objections, Princeton Vanguard admits this request.

Indeed, the definition of the word "cracker," of which we take judicial notice, in pertinent part, is "a dry thin crispy baked bread product that may be leavened or unleavened."[18] A "crisp" may therefore also be a "cracker."

B. Media References, Negative Dictionary Evidence, and Evidence of Consumer Feedback

Defendant has submitted a declaration, with examples, from Christopher Lauzau, which states that he conducted several LexisNexis Mega News database searches for the terms "pretzel crisp" or "pretzel crisps" for results both before and after October 2004 (Defendant's attested date of first use).[19] According to Mr. Lauzau, he removed

---

[17] 91195552 46 TTABVUE 152.

[18] *www.merriam-webster.com/dictionary/cracker*. The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or have regular fixed editions. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014); *Threshold.TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1038 n.14 (TTAB 2010); *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006).

[19] 91195552 36 TTABVUE 3-6, and Exs. 1-4.

some duplicative and some non-applicable entries, and of the remainder, "a total of 216 (83%) clearly referred to PRETZEL CRISPS as a brand name of snacks produced by Snack Factory or its licensees. . . . In contrast, only 36 results (14%) referred to that phrase in a way that may have been a generic reference. Of these, 6 were the same article repeated in different publications."[20] Mr. Lauzau, a Senior Legal Research Analyst associated with Defendant's counsel, has not been qualified or presented as an expert in the field of trademark law, and in any regard, we cannot substitute his legal conclusions for our own. *Cf. Edwards Lifesciences Corp. v. VigiLanz Corp.,* 94 USPQ2d 1399, 1402 (TTAB 2010) ("[T]he Board is responsible for determining whether the marks are similar, and we will not substitute the opinion of a witness, even an expert witness, for our evaluation of the facts.") (citing *Fisons Ltd. v. UAD Laboratories, Inc.,* 219 USPQ 661, 663 (TTAB 1983) ("The opinions of witnesses, even expert witnesses, on the question of likelihood of confusion "are entitled to little if any weight and should not be substituted for the opinion of the tribunal charged with the responsibility for the ultimate opinion on the question." (citations omitted)). Furthermore, although Mr. Lauzau stated that he removed from his analysis duplicate articles "that appear in the same publication," he admitted that he did not account for the various articles in the results that are duplicates appearing in different publications. Thus, we cannot give any weight to his finding as to the percentages that list the term in a particular fashion, and we make our own findings, as stated below.

---

[20] 91195552 36 TTABVUE 3-4.

First, we note that there are many instances in the record where the term "pretzel crisps" is set forth in lower case, with no apparent reference to the term as a brand, or to Defendant, indicating an understanding by the relevant public that the term "pretzel crisps" refers to a product rather than to a single producer thereof. We note that many of these excerpts, from business as well as industry publications, are the work of authors who indicate an understanding that a brand is referenced by use of uppercase letters. Yet they use lower case letters to spell "pretzel crisps" (emphasis added):

> Fashion Week's Latest Digital Moves: By Rachel Strugatz; . . . buyers can track the whereabouts of #FashionWheels to catch a ride – which will also be stocked with "Survival Kits" of Prometheus Springs water, Zoya nail Polish, Vita Coco coconut water, **pretzel crisps** and Six Scents (Six perfumes created by six artists for charity).
> Women's Wear Daily; February 9, 2012; 91195552 36 TTABVUE 37-38

> Clean Start; By Miranda Levenstein
> On the other hand, my in-between meal nibbling is really a problem, and not because of anything to do with weight but because I'm not even enjoying the nibbling. It's completely mindless. If there's even an open bag of **pretzel crisps** on the counter I'll grab a few on the way to unloading the dishwasher or I'm unwrapping a dark Hershey's kiss while I'm talking on the phone . . .
> Slashfood; January 17, 2012; 91195552 36 TTABVUE 45

> Reds, Whites and Blues Fest provides summer fun: By Deborah Hayes Moore; For the occasion, Kathy Holmes and her staff at Pepper Tree Steaks 'N Wines prepared cranberry and pecan chicken salad, chunky cheese dip served with **pretzel crisps**, and pork tenderloin enjoyed on Millie Ray's Rolls.
> The Montgomery Advertiser; August 16, 2011; 91195552 36 TTABVUE 77

> Tippecanoe County restaurant inspections: There are containers of motor oil stored beside potato fries, and Heet antifreeze stored beside **pretzel crisps** in the back dry storage area. To be corrected today.

14

Journal and Courier (Lafayette, Indiana); September 6, 2009; 91195552 36 TTABVUE 156

Gearbox: By Josh Noel: . . . Could be a light meal but is closer to snack territory. Offerings include a Riviera picnic, consisting of couscous, hummus, pita chips (among other things); Jungle Munch, consisting of **pretzel crisps**, veggie cheese dip, apple sauce and trail mix; and Salami and Cheese, consisting of – you guessed it.
Chicago Tribune; February 15, 2009; 91195552 36 TTABVUE 166


More Casey Anthony Jail House Tapes Released: By Nancy Grace, Mike Brooks; You know, for somebody who's apparently grieving or says she's grieving over her kidnapped daughter, this woman is very focused on her own stomach. Snickers bars, strawberry bars, **pretzel crisps**, pork skins, let's see what else here. Beauty product, Chex Mix peanut butter, mouth wash, lemonade.
CNN; December 4, 2008; 91195552 36 TTABVUE 173

One stop shop; FRESH TALK: By Richard Turcsik; . . . ranch dip, beef or turkey bites and cheddar or mozzarella cubes; and TheVeggiecafessens—veggie platters with savory classic hummus, spinach or artichoke dips, along with multi-grain items such as pita chips, sourdough breadsticks and **pretzel crisps.**
Grocery Headquarters; December 1, 2008; 91195552 36 TTABVUE 175

Nosh Pit; by Sean Daly, Stephanie Hayes; Free food; Two tortilla chips with artichoke spinach dip, **pretzel crisp** with garlic-smoked mozzarella spread, two cups Moose Munch.
St. Petersburg Times (Florida); August 24, 2008; 91195552 36 TTABVUE 179

Time to stock up to chow down: By Stephanie Akin; Walker, of the Rochelle Park ShopRite, said he'd just finished a special order for buffalo-wing flavored **pretzel crisps**, the type of request he expected to keep hearing until game time on Sunday.
The Record; February 2, 2008; 91195552 36 TTABVUE 192

Variety packs: Cracker manufacturers have created almost a second snack aisle in the grocery store with an array of baked **pretzel crisps**, pita chips, crunchy sticks and bold, new flavors of poppable snack crackers.
Snack Food & Wholesale Bakery; February 1, 2009; 91195552 36 TTABVUE 169

Does this Adorable Little Lunchbox Hold the Key to Portion; By Liz Balmaseda; . . . On her least successful day, she packed leftover pasta, meatballs and **pretzel crisps** for a whopping 17 points.
Palm Beach Post; March 7, 2012; 91195552 36 TTABVUE 20

Hot and spicy snacks heat up snack food industry in the US: . . . New products that offer consumers something new, like **pretzel crisps** and popchips are also proving popular in the snack food world.
AFP Relaxnews; February 15, 2012; 91195552 36 TTABVUE 35

The Indoorsman – Taking stock on birthday No. 34
Thai lime cashew, chocolate-covered toffee rolled in chopped pistachios, organic lollipops, **pretzel crisps,** dark-chocolate peanut butter cups. The list goes on. And, as was bound to happen, I ate most of it as soon as I got home.
Yakima Herald-Republic (Washington); February 9, 2012; 91195552 36 TTABVUE 37

Lunchbox: By Jenn Smith; The to-go box my sandwich came in was also filled with crinkle-cut potato chips. So I saved the bag of **pretzel crisps** (which cost an astounding 35 cents) for later. The only thing that could have completed this lunch better is a dill pickle spear.
The Berkshire Eagle (Pittsfield Massachusetts); October 5, 2011; 91195552 36 TTABVUE 68-69

What's on?: By Felicia C. Haney; . . . Ditch the chips 'n dip and go for some all natural **pretzel crisps** and hummus. Add corn, asparagus and squash to the grill as well, and toss up some salads.
Call & Post (All Ohio); May 25, 2011-June 1, 2011; 91195552 36 TTABVUE 96

Heard & Scene: Off the Beaten Track, a Plus-Size Show; By Marshall Heyman; . . . set aside her gift bag. (It featured some beauty products, a bag of pistachios, a shot of wheat grass, a no-calorie sparkling kiwi strawberry beverage and a bag of **pretzel crisps,** which in a very plus-size fashion, a reporter finished as he wrote this story.)
The Wall Street Journal; September 16, 2010; 91195552 36 TTABVUE 123-124

An update for the old snack attack: By Kim Brown; . . . It is likely that you will have hummus and falafel chips or **pretzel crisps** at your next party instead of the traditional chip-and-dip duo. The dips are healthier, spicier and often served hot.

16

Tulsa World (Oklahoma); September 8, 2010; 91195552 36 TTABVUE 126

Susquehanna Runs Through Food Lover's Paradise At First-Ever Fundraising Festival: By Mary Beth Schweigert; Bube's staff will come armed with a German Wit beer and English nut-brown ale, along with blue cheese and bacon meatballs, tapenade and French bread toasts, and beer cheese spread and **pretzel crisps**.
Lancaster New Era; June 17, 2009; 91195552 36 TTABVUE 161

Pretzels escape economic crunch: one favorite salty snack is holding its own, despite a wobbly financial world; Snack Trends: By Anne Ford; . . . "There's been everything from a lattice shape to a **pretzel crisp**, which is kind of flattened to give somewhat the experience of a potato chip," Thomas says.
Confection & Snack Retailing; March 1, 2009; 91195552 36 TTABVUE 164

Snacks call my name; The Final Word: By Marina Mayer; Everywhere I look, they're staring at me. In front of me are bags of potato chips and pretzels sitting in boxes aligning the floor. On the shelves behind me are **pretzel crisps,** energy bars, crackers in all shapes and forms and tempting sweets lined up in categorical order.
Snack Food & Wholesale Bakery: May 1, 2008; 91195552 36 TTABVUE 184

Food that's good to go: By Cheryl V. Jackson; . . . GoPick Inc. last week launched its new kid's pack, which meets California's nutritional guidelines for schoolchildren. The company sells snack packs that require refrigeration and include components such as mixed nuts, **pretzel crisps**, dried fruit, puffed corn snacks, swiss cheese and toffee candy.
Chicago Sun Times; October 15, 2007; 91195552 36 TTABVUE 198

Sophisticated snacks meet success: . . . Taking their cue from these findings, manufacturers are progressively incorporating such value-added ingredients as fiber, protein, minerals and healthy fats into everything from cereal bars to **pretzel crisps.**
Candy & Snack Business; September 2007; 91195552 36 TTABVUE 200

Other references include the term "PRETZEL CRISPS" variably in both upper and lower case, indicating mixed perceptions by their authors, suggesting that there may

be an available brand of "PRETZEL CRISPS" for snack products, but also suggesting

that the term "pretzel crisps" identifies a category or genus of goods deriving from

multiple sources (emphasis added):

> Quick review of new products Snack Factory **Pretzel Crisps**: White Chocolate & Peppermint ($4.49 at Whole Foods): By Robin Davis; You might have seen **pretzel crisps** in a variety of flavors, but you probably haven't seen these.
> The Columbus Dispatch (Ohio); December 15, 2010; 36 TTABVUE 111
>
> Pretzels for everyone: By Lucy Blatter; For hungry and tired shoppers, help is on the way today. Dozens of Santas and elves will hit the streets to hand out over 45 thousand crunchy **Pretzel Crisps**. The free **pretzel crisps** will be available at Columbus Circle, Times Square, Rockefeller Center, Herald Square and the R.A.F. Post Office at 34th Street, starting at 9 a.m.
> Urbanite; December 16, 2008; 91195552 36 TTABVUE 171
>
> Snack happy: By Craig Levitt; . . . The Wilson's latest creation is **Pretzel Crisps**, which Warren Wilson describes as a hybrid between a pretzel and a cracker. "We have been able to take the middle out of a pretzel making the **pretzel crisp** a thin crunchy cracker-like snack," he says. . . most supermarkets have placed **pretzel crisps** in the deli section as opposed to the snack aisle, something he is happy with.
> Grocery Headquarters; April 1, 2008; 91195552 36 TTABVUE 189-190
>
> "We were quite surprised to see the sales results increase in healthier snacks": The manufacturer of **Pretzel Crisps** has now made its all-natural, oven-baked, fat-free pretzel crackers available in 100-calorie packs in Original flavor. . . . All of the company's **pretzel crisps** carry kosher pareve certification from the Orthodox Union.
> Progressive Grocer; August 2007; 91195552 36 TTABVUE 202

Finally, we note articles that clearly reference Defendant or its affiliate as a

company, but nonetheless include the term "pretzel crisps" in lower case, with an

apparent indication that the authors, including those writing for trade or industry

publications, view Defendant as only one of several potential sources of a "pretzel

crisps" product, i.e., as a genus of product, not a brand (emphasis added):

18

Pretzel cracker contest finishes with a twist: By Amanda Gold; . . . The third-place award went to the originators – widely available brand The Snack Factory $2.50/6 ounces at Andronico's. These **pretzel crisps** were "nicely browned" and "bubbly" with a "great crunch" and only "mildly salty" flavor.
San Francisco Chronicle; January 21, 2009; 91195552 36 TTABVUE 170

Cross-merchandising boosts sales in deli departments: . . . THE SNACK FACTORY'S thin **pretzel crisps**, which come in five flavors, often merchandises alongside hummus, specialty cheeses and/or or [sic] deli meats.
The Food Institute Report; August 18, 2008; 91195552 36 TTABVUE 180-181

2 Chocolate-covered **pretzel crisps;** New Products: Company: The Snack Factory, Princeton, N.J.: Product Snapshot: Chocolate and peanut butter lovers rejoice with all-natural, thin and crunchy **pretzel crisps** immersed in rich chocolate and creamy peanut butter. Plus, **pretzel crisps** have no trans fat . . .
Snack Food & Wholesale Bakery: May 1, 2008; 91195552 36 TTABVUE 183-184

Twist of fate: By Lynn Petrak: Chocolaholics also can hone in on other indulgent pretzel varieties. Last summer, The Snack Factory rolled out new chocolate covered **pretzel crisps** . . .
Snack Food & Wholesale Bakery: March 1, 2008; 91195552 36 TTABVUE 192-193.

Overall, the Lauzau exhibits contain many references to the term "pretzel crisps" in lower case, while using upper case letters for other terms that are presumably considered by the authors to be brand names. On the whole, this evidence indicates that consumers reading these articles may see Defendant as a potential source of "pretzel crisps," or "pretzel crackers," but would not view the applied-for mark "PRETZEL CRISPS" as a trademark identifying the source of the goods.

Mr. Lauzau also included evidence with his declaration that the term "pretzel crisps," as a whole, does not appear in any dictionary.[21] However, he also notes that the term does not appear in the dictionary entries as a source-indicating designation either. *Id.* These facts tend to indicate that dictionary editors do not find the term noteworthy enough to warrant an entry of any type. Mr. Lauzau also referenced a Google search for the term "pretzel crisps." The results are not very probative since the Google results are very truncated and do not provide us with sufficient information upon which to make a clear finding. *See In re Bayer Aktiengesellschaft,* 488 F.2d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007) ("Search engine results – which provide little context to discern how a term is actually used on the web page that can be accessed through the search link – may be insufficient to determine the nature of the use of a term or the relevance of the search results to registration considerations."); *See also Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.,* 107 USPQ2d 1750, 1759 (TTAB 2013) (results from search engine introduced by testimony admissible but of limited probative value because they lacked sufficient context), *aff'd,* 565 F. App'x 900 (Fed. Cir. 2014) (mem.).

Turning from the Lauzau evidence, the record also contains product reviews where the term "PRETZEL CRISPS" appears to reference a product available from multiple sources (emphasis added):[22]

---

[21] 91195552 36 TTABVUE 7, and Ex. 5.

[22] Other product reviews were duplicative or otherwise included as articles in the Lauzau search results.

2010 ChefsBest100 Award for Best Taste Winner: Pretzel Crisps: Pepperidge Farm: The best **pretzel crisps** will be dark gold and have a light sheen, with granules of salt visible on at least one side of each crisp. There should be a minimal amount of broken pieces in a fresh bag. Chefsbest.org; 91195552 40 TTABVUE 17.

Tastiest snack crisps: **Pretzel crisps**: New York Style's are large crunchy triangles, very toasted, with a big pretzel flavor. Pepperidge Farm's are large, crunchy, flattened pretzels that are a little buttery and sweet.
Consumer Reports magazine June 2009; 91195552 46 TTABVUE 82.

Plaintiff also submitted evidence of consumer feedback in the form of the following email excerpts to Defendant (emphasis added):

I just was munching some **pretzel crisps**, thinking about how awesome they are. . . [Email to info@pretzelcrisps.com] May 12, 2008; 91195552 40 TTABVUE 91 (attached to June 14, 2012 Paul Madrid declaration)

I just wanted to let you know that you guys have the best **pretzel crisps** ever. The other day I bought another brand at a different store. They were so salty I could not even give them away to anyone and ended up throwing them out. Your chocolate covered pretzel crisps are to die for. Email to info@pretzelcrisps.com; January 17, 2008; 91195552 40 TTABVUE 95 (attached to June 14, 2012 Paul Madrid declaration)

Use[d] to be able to find **pretzel crisps** in almost every store but here in Brunswick, Maine, they are very hard to find. Any suggestions as to where I could find them.
Email to Snack Factory employee; April 5, 2010; 91195552 40 TTABVUE 100 (attached to June 14, 2012 Paul Madrid declaration)

I found the Garlic Pretzel Crisps at our Cincinnati Ohio Costco. But am looking for a plain **pretzel crisp** from a local retail.
Email to info@pretzelcrisps.com; March 7, 2006; 91195552 40 TTABVUE 102 (attached to June 14, 2012 Paul Madrid declaration)

I recently went on vacation to western North Carolina and was shopping in a little gourmet store that carried a brand of **pretzel crisps** named Robert Rothschild.
Email to info@pretzelcrisps.com; September 17, 2010; 91195552 40 TTABVUE 198 (attached to June 14, 2012 Paul Madrid declaration)

21

We look at the context of these product reviews and emails, and the fact that the authors in each instance used upper case letters for some words -- often to indicate brands -- but not for the asserted mark "PRETZEL CRISPS," thus showing that the author perceived "PRETZEL CRISPS" to refer to a product that may derive from multiple sources rather than to refer to a mark controlled by a single source.

Overall, and taking into account the number of media articles, their sources, and what the contexts show about the authors' recognition of brand names, we find that the media references, product reviews, and the consumer feedback support a conclusion that the term "PRETZEL CRISPS" is more likely to be perceived by the relevant public as a name for a type of snack product that may derive from multiple sources, rather than as a brand that emanates from a single source.

C. Use by Defendant and its Distributors

Defendant has submitted various declarations and exhibits evidencing its use of the term "PRETZEL CRISPS" as a mark.[23] Warren Wilson, Manager and co-founder of Defendant, stated that its affiliate Snack Factory "pioneered the pretzel cracker."[24] He further testified that "[b]ased on my experience in the industry and my discussions with wholesalers, distributors, retailers, and consumers, I am confident that the term PRETZEL CRISPS is widely recognized as a brand name for our specific brand of pretzel crackers."[25]

---

[23] In addition to the 91195552 37 TTABVUE 2-17; 91190246 27 TTABVUE 278-292.

[24] 91195552 37 TTABVUE 13.

[25] 91195552 37 TTABVUE 3. (See section on "Acquired Distinctiveness" for more detailed information about Defendant's use of "PRETZEL CRISPS").

Defendant also submitted declarations from four distributors, testifying that the term is not used generically in the industry. John O'Donnell testified that "[o]f the snack foods that we supply to retailers, Snack Factory's product is the only product that uses the term PRETZEL CRISPS. I am not aware of any other product on the market that uses PRETZEL CRISPS."[26] Gary Plutchok testified that PRETZEL CRISPS is a "trade name," and that generic terms include "pretzel crackers, pretzel chips, or flat pretzels."[27] Salvatore D'Agostino testified that "business contacts, including national and regional retailers . . . uniformly use the PRETZEL CRISPS mark to refer only to Snack Factory's pretzel crackers;"[28] and Mark Finocchio testified that he was not aware of anyone else using the term "PRETZEL CRISPS" to describe snack foods before 2004 or since.[29] While these declarations inform us of the personal knowledge and opinions of the four declarants, they represent a very small subsection of snack food distributors. Together, they appear to account for only about 6 to 10 percent of the distributorship of Defendant's product, primarily in the northeast, and to some extent the southeastern United States.[30] More to the point, they are distributors, not end consumers of Defendant's product, and to the extent they purport to convey the views and comments of such consumers, such commentary constitutes speculation and inadmissible hearsay. *See In re Pacer Technology*, 338

---

[26] 91190246 27 TTABVUE 279.

[27] 91190246 27 TTABVUE 284.

[28] 91190246 27 TTABVUE 288.

[29] 91190246 27 TTABVUE 292.

[30] 91190246 27 TTABVUE 278-292; *cf.* 91195552 37 TTABVUE 5.

F.3d 1348, 67 USPQ2d 1629, 1633 (Fed. Cir. 2003) (submitted affidavits "all signed by individuals in the artificial nail business, at most purport to represent the views of a small segment of the relevant market."); *see also Mag Instrument, Inc. v. Brinkman Corp.,* 96 USPQ2d 1701, 1723 (TTAB 2010) ("There is no evidence to suggest that this was a random selection of possible declarants." None, "except possibly one, is described as an end consumer.").

We also note that Defendant has made reference in marketing of its product to the generic nature of the "PRETZEL CRISPS" term (emphasis added):

> Russ – Per our conversation, I was hoping you and PGW braintrust could mull over some creative names we might be able to use as an umbrella brand for Pretzel Crisps. Currently, we do have a copyright on the name Pretzel Crisps, but because it's a two pretty generic words [sic], there could be a challenge to it.
> Email from Perry Abbenante, Vice President of Marketing, Snack Factory; Dated December 19, 2009; 91195552
> 40 TTABVUE 233 (attached to June 14, 2012 Paul Madrid declaration)
>
> . . . I have seen your new line of healthy snack foods in the stores & think Pretzel Crisps would be a great addition. We are the original **pretzel crisp** company about to introduce a new package which is much more appealing to your demographic than our current deli line.
> Email from Maureen Phelan, VP of Sales, Natural Channel, Snack Factory; Dated March 23, 2010; 91195552
> 40 TTABVUE 238 (attached to June 14, 2012 Paul Madrid declaration)

We find the declarations submitted by Defendant, and which were created for the purpose of this proceeding and may be from interested declarants, to be of limited probative value in our analysis of the understanding of the term PRETZEL CRISPS by the relevant purchasing public. Rather, we find that while Defendant has used "PRETZEL CRISPS" to identify source, it has also used the term "pretzel crisps" to

identify the type of goods, which has contributed to and otherwise reflects a generic understanding of the term. We also analogize to the case *Bayer Co., Inc. v. United Drug Co.,* 272 F. 505 (S.D.N.Y. 1921).[31] In determining that the term ASPIRIN had been used in a non-source-identifying fashion, Judge Learned Hand held that there were two classes of consumers, and that even though retail druggists, and those in the trade understood ASPIRIN to identify source, "the general consuming public" did not understand it as a mark. We now turn to the survey experts' evidence.

### D. Expert Surveys

As noted, both parties submitted surveys and expert declarations. Each party proffered the results from a "Teflon" survey conducted to test how consumers perceive the term "PRETZEL CRISPS."[32] Unsurprisingly, the surveys reached differing results on the question of whether the term "PRETZEL CRISPS" is generic in relation to "pretzel crackers," and each party has criticized the survey conducted by its adversary.

As described by Professor McCarthy, "A 'Teflon survey' is essentially a mini-course in the generic versus trademark distinction, followed by a test." J. Thomas McCarthy, 2 **MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION** § 12:16 (4th ed. June 2017 Update) (hereinafter "McCarthy"). Preliminary to our discussion of the survey experts' evidence, we note that various courts have found that Teflon surveys are only

---

[31] This case was not reported in BNA and has no USPQ cite.

[32] A "Teflon" survey refers to the format of the survey used in *E. I. du Pont de Nemours & Co. v. Yoshida International, Inc.,* 393 F. Supp. 502, 185 USPQ 597 (E.D.N.Y. 1975) to demonstrate that the coined term "Teflon" had not become generic.

appropriate to consider in a case where the question is whether a coined or arbitrary mark has become generic, and is not appropriate to prove recognition of an otherwise not inherently distinctive mark.[33] We discuss this issue in more detail, *infra*, but note initially that we agree with those circuit court decisions that Teflon surveys are not relevant when a term is not inherently distinctive. The discussion provides our additional thoughts on the proffered surveys, had they been admissible on the question of genericness.

1.    Jay survey conducted on behalf of Defendant.

Dr. E. Deborah Jay, founder and President of Field Research Corp., was retained as an expert by counsel for Defendant. She conducted a "double-blind" survey by phone between the 16th and 25th of February, 2010. The eligibility criteria were defined as adults who had "personally purchased salty snacks for themselves or for someone else in the past three months or think that they would do this in the next three months."[34] As a gateway, in accordance with the Teflon format, survey respondents were given a mini-course, and then a mini-test. That is, they were given an explanation of the difference between brand and common names, and then asked both whether BAKED TOSTITOS is a brand or common name, and whether TORTILLA CHIPS is a brand or common name. Only those who answered both

---

[33] Cases include decisions from the Fourth, Seventh, and Eighth Circuits, as well as one from the District of Massachusetts, more fully discussed, *infra*. Although the Federal Circuit has not ruled on this specific issue, we cite cases where the Federal Circuit has found similar situations to constitute "de facto secondary meaning."

[34] 91195552 35 TTABVUE 5-6.

questions correctly were allowed to proceed with the survey. Initially 500 adults were questioned regarding their eligibility to participate in the Jay survey. Of those, only 347 of the 500 met the eligibility requirements to take the mini-test, and 222 of the 347 answered both questions correctly on the mini-test, so as to be considered "qualified respondents," and thus proceeded to take the Jay survey.[35] These respondents then were questioned about a number of terms and asked whether they are "brand" or "common" names, with the option available to say "don't know."[36]

Of the 222 respondents who participated in the Jay survey, the results were as follows:

| Name | Brand | Common | Don't know/ Haven't Heard |
|---|---|---|---|
| SUN CHIPS | 96% | 3% | <1% |
| CHEESE NIPS | 85% | 13% | 2% |
| **PRETZEL CRISPS** | **55%** | **36%** | **9%** |
| FLAVOR TWISTS | 48% | 34% | 18% |
| GOURMET POPCORN | 25% | 72% | 3% |
| ONION RINGS | 8% | 91% | 1% |
| MACADAMIA NUT | 7% | 92% | <1% |

---

[35] 91195552 35 TTABVUE 6-7.

[36] Consumers in the Jay survey were asked in response to each question whether they considered each item to be a brand or a common name. They were told at the beginning of the survey to state if they had not "heard of a name" or didn't "know what it refers to." 91195552 35 TTABVUE 52.

Based on these results, Dr. Jay concluded in her report that "the primary significance of the name PRETZEL CRISPS to the relevant universe of consumers is as a brand name and not a generic or common name."[37]

Dr. Alex Simonson, founder and President of Simonson Assoc., Inc., was retained as an expert by counsel for Plaintiff, and to rebut the conclusions of Dr. Jay. Dr. Simonson noted that less than 65% of the 347 who were considered eligible, then were qualified as respondents and included in the survey. Dr, Simonson attributes this to the underinclusive nature of what he referred to as the "improper" gateway test, and that accordingly, the Jay survey is flawed.[38] In particular, Dr. Simonson states, "We are left wondering what the other 34% of the [eligible] universe that Jay removed from interviewing would have thought." Dr. Simonson also noted that Dr. Jay added no further controls, and that, despite passing the gateway mini-test questions, two participants in the Jay survey incorrectly selected "brand" for each option, an anomaly that was not discounted in the results.[39]

Dr. Simonson did not cite any authority for the low pass rate on the mini-test as being problematic, nor are we aware of any. On the other hand, we find probative the criticism that Dr. Jay's instruction as to the meaning of a mark in the mini-course may have been ambiguous to participants in the Jay survey. In particular, the Jay survey used the term "WHEAT THINS" as an example of a brand.[40] The issue with

---

[37] 91195552 35 TTABVUE 13.

[38] 91195552 49 TTABVUE 129.

[39] 91195552 49 TTABVUE 136, n.3.

[40] 91195552 35 TTABVUE 26.

this choice, is that it is not a highly distinctive mark, and thus not a good example to participants of how to distinguish between a distinctive term and a merely well-advertised highly descriptive or even generic term. As we noted in a recent case, this can be problematic in a genericness survey.[41] *See Sheetz of Del., Inc. v. Doctor's Assocs. Inc.,* 108 USPQ2d 1341, 1361 (TTAB 2013) (criticizing use of the "highly descriptive" terms QUARTER POUNDER and ORIGINAL RECIPE in the mini-course as examples of brands). Thus participants, given this instruction by Dr. Jay, may have been confused as to the difference between generic terms that, although highly advertised can never acquire trademark status, as compared with terms that although they are merely or even highly descriptive, may be capable of acquiring distinctiveness. *Id.* Thus, even if we had considered the Jay survey, consistent with our findings in *Sheetz,* we would have been constrained to accord less probative value to its results.

2.   Simonson survey conducted on behalf of Plaintiff.

Dr. Simonson, conducted his own survey between August 15 and September 3, 2011. The screening criteria were defined as follows: "purchasers of salty snacks at supermarkets or grocery stores within the past 6 months or likely purchasers of salty snacks at supermarkets or grocery stores within the coming 6 months."[42] In a "double-

---

[41] In *Sheetz,* we referred to the problem of using a highly descriptive term in the mini-course, as it could confuse participants regarding the meaning of a brand.

[42] 91195552 35 TTABVUE 113.

blind" survey, his interviewers conducted interviews, by phone, in the following manner, of 250 survey participants who met the eligibility requirement:

1. The interviewer read aloud to survey respondents definitions of "category names" (generic names) and "brand names" and asked if survey participants understood the definition of a common name and a brand name. Only 2 respondents indicated they did not, and they were removed from the survey. 248 then continued on.[43]

2. Participants who said they understood the difference between a category name and brand name were then read a list of names individually for food and some unrelated products and asked whether they thought each name was a category name, a brand name, "don't know", or "not sure." The list, with results, follows:

Results By Name:

| Name | Brand | Category | Don't know/ Not Sure |
|---|---|---|---|
| RITZ BITZ | 82% | 12% | 7% |
| LUCKY CHARMS | 87% | 10% | 3% |
| I-POD | 61% | 28% | 11% |
| AMERICAN AIRLINES | 89% | 9% | 2% |
| TRISCUIT | 80% | 13% | 7% |
| **PRETZEL CRISPS** | **41%** | **41%** | **18%** |

---

[43] 91195552 35 TTABVUE 120.

| | | | |
|---|---|---|---|
| GINGER ALE | 25% | 72% | 3% |
| AUTOMOBILE | 9% | 91% | 1% |
| POTATO CHIPS | 8% | 90% | 2% |
| NEWSPAPER | 5% | 93% | 2% |
| POPCORN | 6% | 93% | 1% |

Based on these results, Dr. Simonson concluded in his report that overall, "PRETZEL CRISPS is not perceived by a majority of consumers as a brand name."[44]

Defendant's expert, Dr. Jay, was retained to rebut the conclusions of Dr. Simonson. She noted several problems with his methodology including the following: 1) the universe of survey participants was improper because it included only those who purchase salty snacks at certain places; 2) there were two options of giving no opinion, both "don't know" and "not sure," which may have confused participants, and caused some to choose one or the other incorrectly; 3) Dr. Simonson did not conduct a prescreening/gateway test to ascertain whether survey participants understood the difference between brand and common (or category) names, but rather simply *asked* whether they did[45]; and 4) Dr. Simonson's conclusions were inconsistent with his data.[46]

We find the first two criticisms to be inconsequential. As to the first issue, Dr. Simonson's sampling was appropriate to the universe of consumers of salty snacks

---

[44] 91195552 35 TTABVUE 121.

[45] Indeed, as pointed out by Dr. Jay, only two survey participants indicated they did not, or less than 1%.

[46] 91195552 35 TTABVUE 166-167.

that would be most likely to be familiar with terms like "PRETZEL CRISPS." In this regard, we note that the Mantis survey, conducted by Defendant and discussed *infra*, also focused on grocery shoppers. As to the second issue, there is no reason to believe that participants understood the question "or are you not sure or do not know?" as presenting two separate options.[47] Nor is there reason to think that being asked this would cause anyone who otherwise had an opinion to change that opinion from "brand" to "category" or to "don't know/not sure." To the extent Dr. Jay criticized the option of any uncertain response, we note that Dr. Jay's survey also included an instruction for participants who had not "heard of a name" or didn't "know what it refers to" to report that. As such, Dr. Jay's criticism of the Simonson survey on this point is not probative, or if probative provides a criticism also applicable to Defendant's survey discussed *supra*.

With respect to Dr. Simonson's failure to administer an initial prescreening mini-test, an analogous situation was at issue in the recently decided *Sheetz* case. 108 USPQ2d at 1360. In *Sheetz*, the Board determined that "[a]sking a respondent whether he or she understood the difference is not the same as *testing* whether she or he understood the difference." (emphasis in original). The Board there noted that we can give "little weight" to a survey where a mini-test was not performed and we do not know whether survey participants actually understood what they were being asked. *Id.* at 1361-1362, citing *Jacob Zimmerman v. National Association of Realtors,* 70 USPQ2d 1425, 1435-36 n.15 (TTAB 2004) (flaws in the design and administration

---

[47] 91195552 35 TTABVUE 117.

of the survey, including the mini-test, resulted in the survey having limited probative value). We note that Dr. Simonson did perform other controls, such as checking the data to ensure that none of the participants responded by selecting all brand or all category in response to the choices given in the survey.[48] Nevertheless, per our findings in *Sheetz,* and *Zimmerman,* we find Dr. Simonson's failure to administer an initial mini-test problematic for the Simonson survey.

Finally, Dr. Jay contends that Dr. Simonson does not correctly state the conclusions of his survey. In particular, whereas Dr. Simonson states that 41% view the term "PRETZEL CRISPS" as a mark, which is less than a majority, Dr. Jay contends that real value is 50% of those who "expressed an opinion" find it to be a brand name, and thus it is "a 'statistical tie.'"[49] In a deposition of Dr. Simonson taken on March 29, 2012, the following exchange occurred:[50]

> Q: Now, with respect to the 18 percent who give us a don't know answer in response to Pretzel Crisps, would it be appropriate to split those answers and add them to the trade – to the brand name and category name side of the analysis?
>
> A: That is one approach to take with don't know/not sure answers that would be appropriate to analyze. . . .
>
> Q: That would be a prudent approach, right?
>
> A: It would be an acceptable approach. The other approach would be to remove them and look at of those [sic] who had an opinion. There's a number of approaches. The other one is to leave it as is and understand that 18 percent just don't know about this brand or category. (at 157)

---

[48] 91195552 35 TTABVUE 120, n. 9.

[49] 91195552 35 TTABVUE 182.

[50] 91195552 49 TTABVUE 156-157.

Q: My question was: That would be a prudent approach, wouldn't it? [objection]

A: It could be a prudent approach.

Q: And if we did that here, what would the results be?

A: It would be a 50/50 split.

By way of explaining this testimony, Dr. Simonson notes that in interpreting a Teflon survey, one must still look to the actual number who selected "PRETZEL CRISPS" as a brand rather than a category name, which is 41%, and that overall "less than 50% of relevant consumers perceive the term PRETZEL CRISPS as a brand name."[51]

Overall, we find that due to flaws in the survey methodology, if we had considered the survey, the Simonson declarations and survey would have been entitled to only limited weight.

3. Mantis survey conducted on behalf of Defendant

Defendant submitted the survey and declaration of expert George Mantis for the purpose of showing acquired distinctiveness (secondary meaning), as more fully discussed, *infra*. However, since it was conducted in the Teflon format, had we considered the other two surveys we would have also considered this survey on the issue of genericness.[52] *Cf. In re Country Music Association, Inc.,* 100 USPQ2d 1824, 1834-35 (TTAB 2011) ("Finally, although the consumer survey conducted by Dr. Ford

---

[51] 91195552 49 TTABVUE 122.

[52] We also note that the Mantis survey used the same mini-test as the Jay survey, further illustrating why it is useful to consider on the question of genericness.

was submitted in connection with the issue of genericness, the acquired distinctiveness of the term COUNTRY MUSIC ASSOCIATION among the relevant purchasing public can be inferred from the results. By categorizing the term COUNTRY MUSIC ASSOCIATION as a brand name, 85% of the respondents were saying, in effect, that they associated the term with the product or services of only one company."); *see also March Madness Athletic Ass'n, L.L.C. v. Netfire, Inc.,* 310 F.Supp.2d 786 (N.D. Tex. 2003), *aff'd* 120 Fed. Appx. 540 73 USPQ2d 1599 (5th Cir. 2005) (finding Teflon survey by Mr. Mantis offered to prove genericness was also relevant to show secondary meaning).

The survey was conducted via online participation, between August 26 and August 30, 2011. There were 400 survey participants. Respondents were invited by email to participate in the survey, and were told it was about "salty snack foods." Individuals were then asked prescreening questions. To be included in the survey, individuals had to, among other things, be the "primary grocery shopper," be "between the ages of 24 and 39," and "have purchased crackers and pretzels in the past month and will purchase crackers and pretzels in the next month."[53]

Survey respondents were informed during the screening process about the difference between "brand" and "common" names and then allowed to proceed with the survey only if they correctly associated BAKED TOSTITOS with "only one company" and TORTILLA CHIPS with "more than one company."[54] For those who

---

[53] 91195552 55 TTABVUE 2-4.

[54] 91195552 55 TTABVUE 5.

proceeded with the study, two control names were given, and the same questions were asked. The results are shown as follows:

| NAME | Only One Company | More | Don't Know |
|---|---|---|---|
| SUN CHIPS | 96.5% | 3% | .5% |
| ONION RINGS | 23.8% | 72% | 4.3% |
| **PRETZEL CRISPS** | **38.7%** | **47.8%** | **13.5%** |

Based on the survey, Mr. Mantis found that 38.7% of the respondents associated the name "PRETZEL CRISPS" with only one company. On that basis, he stated: "It is my opinion that the name 'PRETZEL CRISPS,' used in conjunction with a salty snack food product, has acquired secondary meaning."[55]

Plaintiff retained Dr. Ivan Ross to rebut the findings of Mr. Mantis. Keeping in mind that the rebuttal was as to a survey offered to show acquired distinctiveness, Dr. Ross' main objection to the Mantis survey is that although Mr. Mantis said that he conducted the survey for the purpose of establishing secondary meaning, Mr. Mantis's methodology actually analyzes genericness.[56] Plaintiff specifically argues that the Mantis survey was conducted in the manner of a Teflon-style survey, in that participants were asked whether they associate each term with one company or with more than one company. In this regard, during the initial mini-course, participants

---

[55] 91195552 55 TTABVUE 28.

[56] 91195552 55 TTABVUE 99.

were specifically instructed as to the differences between "brand" and "common" names:[57]

> Some names are brand names. A brand name refers to a product associated with one particular company. Other names are common names. A common name refers to a type of product associated with more than one company.

As such, participants were told that if they associated a term with "one particular company" then it is a "brand name," and vice-versa. With this instruction given to all participants in the survey, we find it logical to consider all those who said they associated the term "PRETZEL CRISPS" with "one particular company" thus also found the term "PRETZEL CRISPS" to be a "brand name" rather than a "common name," and that all those who said they associated the term "PRETZEL CRISPS" with "more than one company" thus also found the term "PRETZEL CRISPS" to be a "common name" rather than a "brand name." In this regard, only 38.7% of participants, which is rather less than 50%, found the term to be a brand name.

Accordingly, we find that although the Mantis survey was conducted and offered for the purpose of showing secondary meaning, if we had considered the other two surveys on the question of genericness, the Mantis survey should also have been considered on the issue of genericness. Since substantially less than half of the Mantis survey respondents associated the term "PRETZEL CRISPS" with a single source, this survey weighs in favor of finding genericness. We note, in this regard, that even if we were to split the 13.5% percent of "don't know" responses, as suggested

---

[57] 91195552 55 TTABVUE 5.

by Defendant with regard to the Simonson survey, then adding 6.75% to each of the "only one company" and "more than one company" tallies, we still have less than a majority who associate the term with one company, and more than half who associate the term with more than one company, and so we have the same result.

E. <u>Discussion - Genericness</u>

A generic term "is the common descriptive name of a class of goods or services." *Marvin Ginn,* 228 USPQ at 530. "The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *Id.*

To be the first user of a particular name for a product is not sufficient to take it out of the realm of genericness. *Kellogg Co. v. Nat'l Biscuit Co.,* 305 U.S. 111, 39 USPQ 296 (1938). Rather, the question is whether "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.* at 299. As the Federal Circuit has further explained:

> Generic terms, by definition incapable of indicating source, are the antithesis of trademarks, and can never attain trademark status. The reason is plain: To allow trademark protection for generic terms, *i.e.,* names which describe the genus of goods being sold, even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are.

*See In re Pennington Seed Inc.,* 466 F3d 1053, 80 USPQ2d 1758, 1762 (Fed. Cir. 2006) (affirming Board ruling that applicant cannot trademark varietal name for plant seed even if it created genus) (citing *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.,* 828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987)). In this regard, the Court of

Customs and Patent Appeals, citing the *Kellogg* Supreme Court decision, noted that generic marks, even those well known to the public, cannot be registered. *In re The Deister Concentrator Co., Inc,* 289 F2d 496, 129 USPQ 314, 322 (CCPA 1961) ("The true basis of such holdings is not that they cannot or do not indicate source to the purchasing public but that there is an overriding public policy of preventing their monopolization.")

The CCPA has further explained that one who chooses the name of an article cannot be granted exclusive trademark rights to the term:

> While it is always distressing to contemplate a situation in which money has been invested in a promotion in the mistaken belief that trademark rights of value are being created, merchants act at their peril in attempting, by advertising, to convert common descriptive names, which belong to the public, to their own exclusive use. Even though they succeed in the creation of de facto secondary meaning, due to lack of competition or other happenstance, the law respecting registration will not give it any effect.

*Weiss Noodle Co. v. Golden Cracknel and Specialty Co.,* 290 F.2d 845, 129 USPQ 411, 414 (CCPA 1961).

We thus consider whether the term "PRETZEL CRISPS," as a whole, is generic for "pretzel crackers." As a "first step," we consider the evidence bearing on the meaning of the individual constituent terms "PRETZEL" and "CRISPS." *See Northland,* 227 USPQ at 963. This included dictionary definitions; testimony from Defendant's co-founder; the identification of goods; nutrition information proffered by Defendant; testimony from Plaintiff's witness; and information from Defendant's Responses to Requests for Admission. The question Plaintiff has raised is whether

the term "pretzel crisps" is another generic name for the product in question. "There is usually no one, single and exclusive generic name for a product. Any product may have many generic designations. Any one of those is incapable of trademark significance." McCarthy § 12:9. We find, based on all the evidence of record, that Plaintiff has proven by a preponderance of the evidence both that there is no question that "PRETZEL" would be understood by the relevant public primarily as referring to any "pretzel," including a pretzel cracker and that "CRISPS" would be understood by the relevant public primarily as referring to "crackers," also including pretzel crackers. *See Princeton Vanguard,* 114 USPQ2d at 1831, citing *Steelbuilding,* 415 F.3d 1293, 1297, 75 USPQ2d 1420 (Fed. Cir. 2005).

Having reached this conclusion as a first step, we again note that "the combination is not generic unless the entire formulation does not add any meaning to the otherwise generic mark." *Id.* We thus consider available record evidence as to whether joining the individual words into a single term "lends additional meaning to the mark as a whole." *Id.* at 1833, (citations omitted). In doing so, we have considered all of the relevant evidence and arguments presented by the parties.

Most of the media references of record contain references to the term "pretzel crisps" as a whole. While some of these refer to Defendant as the purveyor of the "Pretzel Crisps" brand, there are many articles in the record that refer to "pretzel crisps" generally as a category or genus which could derive from multiple sources, including articles that reference the term "pretzel crisps" entirely in lower case, as an indication that the author does not view it as indicating source. Consumer feedback

also indicates similar treatment of "pretzel crisps" as a genus of goods, that may derive from multiple sources.

While Defendant submitted various declarations, including from four distributors, attesting to the non-generic nature of Defendant's "PRETZEL CRISPS" product, we find these to be of little probative value. They represent a small proportion of Defendant's distributorship. These do not represent the actual, unbiased perceptions of end consumers. *Mag Instrument,* 96 USPQ2d at 1723. *See also Bayer Co., Inc.* 272 F. at 513.

In its decision ruling on the prior appeal of this case, the Federal Circuit looked to "sister circuits" for guidance regarding the importance of surveys. *Princeton Vanguard* 114 USPQ2d at 1833. We note, in this regard, that several such "sister circuits" have found Teflon surveys to be unpersuasive when used outside the specific context of genericide, i.e., testing to see whether a term that may once have been a mark has become generic. Specifically, where, as here, one party claims to have exclusive rights in a term that was not previously controlled by that party as a coined term,[58] courts have found that Teflon surveys are ineffective at determining the true weight of public perception. *See Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.* 240 F.3d 251, 255, 57 USPQ2d 1884, 1886 (4th Cir. 2001) ("Hunt does not claim to have first coined the term 'crab house.' Therefore, it is not necessary to determine whether the term has become generic through common use, rendering Hunt's

---

[58] Although Defendant maintains that it created the term "PRETZEL CRISPS," it asserts rights in the term under Section 2(f) acquired distinctiveness, not as a coined term.

customer survey irrelevant."); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990, 203 USPQ 642, 647 (7th Cir. 1979) ("When Judge Learned Hand said that whether a word is generic depends on what 'buyers understand by the word,' . . . he was referring to a coined word for a commercial product that was alleged to have become generic through common usage. He was not suggesting that the meaning of a familiar, basic word in the English vocabulary can depend on associations the word brings to consumers as a result of advertising."); *Schwan's IP, LLC v. Kraft Pizza Co.,* 460 F.3d 971, 79 USPQ2d 1790, 1794 (8th Cir. 2006) (citing *Hunt Masters* and *Schlitz*) (finding that district court did not err in failing to consider survey in genericness analysis, since this was a situation where term was "commonly used before either party began labeling their frozen pizzas with the term"); *see also National Nonwovens, Inc. v. Consumer Products Enterprises, Inc.,* 397 F.Supp.2d 245, 78 USPQ2d 1526, 1533 (D. Mass. 2005) (citing *Hunt Masters*) (in ruling for defendant on summary judgment and finding plaintiff's asserted mark to be generic, court found survey by plaintiff at trial would be "unnecessary" since plaintiff's asserted mark was not a coined term).

Although there are no circuit court cases going against this line of cases from the Fourth, Seventh, and Eighth Circuits, Defendant cites a district court case that criticizes the position.[59] In *Primary Childrens' Med. Ctr. Found. v. Scentsy, Inc.,* 104

---

[59] Defendant cites another district court case, *Calista Enters. Ltd. v. Tenza Trading Ltd.,* 43 F.Supp. 3d. 1099, 1111 (D. Or. 2014). The case, however, is distinguishable since the court found that there was no evidence that the combined term comprising the asserted mark was not a coined term. Thus the court did not determine, as in *Hunt Masters, Schlitz,* and *Schwan's,* that the asserted mark was *not* coined.

USPQ2d 1124, 1127 (D. Utah 2012), the court found that the plaintiff's mark

FESTIVAL OF TREES for a holiday fundraiser was arbitrary. Nevertheless, the

court further found that there were hundreds of other similar uses by other

organizations. Thus, the court noted that to the extent the defendant contended that

the plaintiff's survey was irrelevant pursuant to the logic set forth in *Hunt Masters*

and *Schwan's,* the court disagreed with those courts:

> [T]he court agrees with authorities that challenge this position and finds
> that consumer surveys can play an important role in determining
> primary significance even if the term at issue was not first coined by the
> party seeking to protect its mark.
> *Id.* at 1129 (citing McCarthy § 12:17.50).

We note that the *Scentsy* case is somewhat distinguishable in that the court did find

the mark at issue to be arbitrary despite third-party use. Furthermore, the court

based its decision on the fact that although there were third-party uses of the term,

none were in Utah, where the plaintiff was based, a fact we cannot consider when

determining the right to nationwide trademark registration.

As noted, Professor McCarthy has expressed in his treatise his personal view that

the finding of *Hunt Masters* is "flawed" and "erroneous." McCarthy § 12:17.50. In

particular, Professor McCarthy expresses concern that arbitrary marks, which are

not "coined" should be allowed to be proven as non-generic, and for this he gives the

examples of the brands SHELL (for oil), IVORY (for soap), and HARP (for lager). We

note, however, that with regard to Professor McCarthy's concerns, it is implicit in the

wording of the cases of the Fourth, Seventh, and Eighth Circuits, in *Hunt Masters,*

*Schlitz,* and *Schwan's,* that an arbitrary mark, similar to a "coined" mark, could be

established as non-generic, potentially via a Teflon survey, although a mark that was not inherently distinctive when first used could not. We also use caution in interpreting the Federal Circuit's case law, as cited by Professor McCarthy in § 12:47 (4th ed. June 2017 Update). *See Opryland USA Inc v Great American Music Show, Inc.,* 970 F.2d 847, 23 USPQ2d 1471, 1476 (Fed. Cir. 1992). The case specifically states that the proceeding is *not* about whether the term "opry," previously determined to be generic, has been "recaptured as a trademark," but rather only discusses the term as a "component" of another asserted mark. *Id.* We follow the Federal Circuit's view of its decision. The *Opryland* case does not stand for any proposition that generic terms can be recaptured as trademarks. We are not aware of any such precedent, nor are we prepared to create it.

Defendant here has filed its Application Serial No. 76700802 for PRETZEL CRISPS for "pretzel crackers," with a Section 2(f) claim of acquired distinctiveness, and Registration No. 2980303 for PRETZEL CRISPS for "pretzel crackers," on the Supplemental Register. These constitute admissions that the term "PRETZEL CRISPS" is not inherently distinctive of "pretzel crackers." *See The Cold War Museum, Inc. v. Cold War Air Museum, Inc.,* 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009) ("where an applicant seeks registration on the basis of Section 2(f), the mark's descriptiveness is a nonissue; an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive."); see also 15 U.S.C. § 23 (The Supplemental Register is set up to include "[a]ll marks capable of distinguishing applicant's goods or services and not registrable on the principal register herein

44

provided . . .”). We note furthermore that the declaration of Christopher Lauzau includes at least three citations to the term "pretzel crisps" in a descriptive manner by third-parties before Defendant's attested first use of the term in October 2004. These include (emphasis added):

> Recipe connection putting on the party food; By Judy Grigoraci; . . . Sprinkle with paprika; bake at 350 degrees about 20 minutes. Serve at room temperature with **pretzel crisps** or crackers. Makes about 2 cups. Charleston Gazette (West Virginia); June 6, 2001.[60]
>
> Grocery List: Deli Thai drummettes; Sonoma mango tea; Salmon fingers; Ginger biscuits; Self-serve gourmet salad bar; Honey-mustard **pretzel crisps**; . . . The San Francisco Chronicle; December 19, 1999.[61]
>
> 50 snacks that won't make you fat; includes recipes for five homemade snacks; By Brian Good; . . . Regular twists, along with flat **pretzel crisps** and crunchy pretzel sticks – our kind of seafood. Men's Health; April 1, 1998.[62]

Based on the foregoing, we find that the term "PRETZEL CRISPS" is not inherently distinctive for "pretzel crackers.

Following the logic of the circuit court cases in the Fourth, Seventh, and Eighth Circuits, and including Federal Circuit precedent, we thus find that the survey results are not relevant, and instead merely reflect what the predecessor court to the Federal Circuit has referred to as "de facto secondary meaning." *See Weiss Noodle Co.* 129 USPQ at 414. To the extent we were to find them to be relevant, we find that they are not probative.

---

[60] 91195552 36 TV 304.

[61] 91195552 36 TV 306-307.

[62] 91195552 36 TV 308-309.

In sum, the record demonstrates that the primary consumer perception of the term "PRETZEL CRISPS," as a whole, is likely to be that of a common name for the identified goods, "pretzel crackers." Furthermore, Defendant's own marketing strategies have contributed to the generic understanding of the term "PRETZEL CRISPS." Although Defendant may have created "de facto secondary meaning" by potentially being the first user (or among the first) of the term "PRETZEL CRISPS," being a dominant force in the marketplace has not prevented the relevant public from viewing "PRETZEL CRISPS" as a "common descriptive name of a class of goods or services," and from "*primarily* us[ing] or understand[ing] the term sought to be protected to refer to the genus of goods or services in question." *Marvin Ginn* 228 USPQ at 530. Overall, the record supports a finding that the primary significance of the term in the minds of the consuming public is to identify a product rather than to identify a single producer of that product, and that indeed the "PRETZEL CRISPS" product may derive from more than one source. *See Kellogg,* 39 USPQ at 299; *In re Merrill Lynch,* 4 USPQ2d at 1142; *Weiss Noodle,* 129 USPQ at 414.

We noted methodological flaws in both the Jay and Simonson surveys that decrease any probative value that could have been assigned to them. Although the Jay and Simonson surveys have differing results, finding either 55% or 41%, respectively, of consumers perceiving the term PRETZEL CRISPS as a brand name, and either 36% or 41%, respectively, perceiving the term as a common name, that does not indicate the strength of such consumer opinions. The Mantis survey results support a finding of genericness. Thus, had we considered the surveys to be relevant

and probative, our conclusion would not have changed because we find that – to the extent they can be understood to measure something – the survey results overall would support a finding of genericness.

Following full consideration of all evidence and arguments, we find that Plaintiff has proven by a preponderance of the evidence that Defendant's asserted mark PRETZEL CRISPS is generic for "pretzel crackers."

Acquired Distinctiveness

We now address the alternative ground asserted by Plaintiff -- in the opposition only -- that Defendant's applied-for mark PRETZEL CRISPS, even if not generic, nonetheless has not acquired distinctiveness. Although we have found the term PRETZEL CRISPS to be generic for "pretzel crackers," we address this alternative ground in the event that the term is found not to be generic on appeal. For purposes of this section, we therefore treat the term as being descriptive rather than generic. *See Sheetz,* 108 USPQ2d at 1367. The remainder of our analysis and findings regarding the evidence of record remain the same. As noted, after registering its asserted mark PRETZEL CRISPS on the Supplemental Register, Defendant later filed Application Serial No. 76700802, disclaiming the right to use the term "pretzel" apart from the mark as shown, but claiming acquired distinctiveness in the whole mark under the provisions of Section 2(f) of the Trademark Act.[63]

---

[63] As noted, this claim is not at issue in the Cancellation proceeding, since acquired distinctiveness is not available for terms on the Supplemental Register.

It is incumbent on Plaintiff to make a prima facie showing at trial that Defendant's applied-for mark has not acquired distinctiveness. *Yamaha International v. Hoshino Gakki*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988) ("To prevent the immediate registration of the mark, the opposer has the initial burden to establish prima facie that the applicant did not satisfy the acquired distinctiveness requirement of 2(f). If opposer does not provide sufficient grounds to at least place the matter in issue, the situation is indistinguishable from one in which no opposition was filed.") In the prior section, we concluded that the relevant public understands the term "PRETZEL CRISPS" to identify a product emanating from more than one source and Plaintiff has thus shown the term "PRETZEL CRISPS" to be generic. In doing so, Plaintiff has shown the term to be at least highly descriptive for purposes of this section. Defendant thus has the burden of showing the acquired distinctiveness of its applied-for mark, and "may then find it necessary to present additional evidence and argument to rebut or overcome the opposer's showing . . . ." *Id.*

To satisfy its burden that its applied-for mark has acquired distinctiveness under Section 2(f) of the Trademark Act, an applicant may submit any "appropriate evidence tending to show the mark distinguishes [applicant's] goods," which evidence opposer could then attempt to discredit. *Yamaha*, 6 USPQ2d at 1010, quoting Trademark Rule 2.41(a), 37 CFR § 2.41(a). Such evidence includes the duration, extent and nature of the use of the mark in commerce, advertising expenditures, letters or statements from the trade or public, and other appropriate evidence.

Trademark Rule 2.41(a). *See also In re Steelbuilding*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005) (acquired distinctiveness may be shown by copying, unsolicited media coverage and consumer surveys). "The amount and character of the evidence, if any, required to establish that a given word or phrase … 'has become distinctive' of the goods necessarily depends on the facts of each case and the nature of the alleged mark." *Roux Laboratories, Inc. v. Clairol Inc.*, 427 F.2d 823, 166 USPQ 34, 39 (CCPA 1970). *See also Steelbuilding*, 75 USPQ2d at 1424 ("no single factor is determinative … the determination examines all of the circumstances involving the use of the mark"). With respect to the nature of the alleged mark, "the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning." *In re Steelbuilding.com*, 75 USPQ2d at 1424. Because we have found that the term "PRETZEL CRISPS" is generic for "pretzel crackers," we will, for this analysis, consider it to be close to the genericness boundary on the continuum. Thus, Defendant has a heavy burden of showing acquired distinctiveness.

Defendant asserts that by its use of "PRETZEL CRISPS" in connection with "pretzel crackers," the term has acquired distinctiveness through its extensive sales and advertising, unsolicited media coverage, as evidenced by the declaration of Manager and co-founder, Warren Wilson and the evidence attached thereto, and as further noted in its distributor declarations and Mr. Mantis' declaration and survey report.

Mr. Wilson testified that Defendant started using the term "PRETZEL CRISPS" on "pretzel crackers," via its affiliate and exclusive licensee Snack Factory, Inc., in 2004. Mr. Wilson attested to over $100 million in retail sales annually of PRETZEL CRISPS since then, with sales growth every year, and an aggregate of "more than half a billion dollars" in retail sales since. PRETZEL CRISPS crackers are now available in over 50,000 retail locations nationwide. Snack Factory's Vice-President of Marketing also testified to aggressive marketing, noting that PRETZEL CRISPS accounted for 28% of the "deli cracker" market as of February 2012, placing it "second" for market share in that category.[64] Though Defendant also submitted declarations from four distributors, attesting to recognition of the PRETZEL CRISPS mark, as noted previously, their statements regarding consumer perceptions and comments amount to speculation and inadmissible hearsay, and thus they have little probative value in our analysis. *In re Pacer Technology*, 67 USPQ2d at 1633; *Mag Instrument,* 96 USPQ2d at 1723. *See also Bayer Co., Inc.* 272 F. at 513.

Snack Factory promotes PRETZEL CRISPS at trade shows, via trade publications, and via general publications, such as *Good Housekeeping, Architectural Digest, House Beautiful, People,* and *Martha Stewart Living*. Mr. Wilson also testified that Snack Factory has invested "many millions" of dollars promoting the PRETZEL CRISPS name, stating that in 2011 marketing costs exceeded $15 million, and "[in] total, since the inception of the brand, Snack Factory has spent more than $50 million marketing its PRETZEL CRISPS brand." He testified to strategically placed

---

[64] 91195552 34 TTABVUE 31.

advertising in high-volume places such as Madison Square Garden and the Lincoln Tunnel in New York City, as well as on billboards around the country, featuring the PRETZEL CRISPS packaging and mark. He also testified to significant unsolicited media attention for PRETZEL CRISPS in print and television media, including, *inter alia,* via NBC's Today Show, the CBS Early Show, Good Morning America, *the New York Times, the International Herald Tribune, The Boston Globe, the Chicago Tribune, New York Daily News*, and the *Philadelphia Inquirer*.[65] While this evidence regarding sales and advertising is impressive, it is significantly undercut by the evidence discussed previously that the relevant public and many survey respondents, including more than half the respondents to the Mantis survey, perceive the term "pretzel crisps" as referring to a product that may derive from multiple sources. Ultimately, the question is not the extent of advertising and promotion, but the success of it in establishing brand recognition. *See Steelbuilding*, 75 USPQ2d at 1424.

Mr. Mantis' survey concluded that 38.7% of participants associated the term "PRETZEL CRISPS" with "only one company."[66] The parties disagree as to whether this number is sufficient to establish secondary meaning. While the interpretation of the number appears to be within the discretion of the fact finder, we note that it has been stated that numbers in this range are "marginal." *See Shuffle Master Inc. v. Awada,* 83 USPQ2d 1054, 1057 (D. Nev. 2006) (finding a secondary meaning survey showing 35% association to be probative); *but see Thomas & Betts Corp. v. Panduit*

---

[65] 91195552 37 TTABVUE 2-12, and exhibits attached thereto.

[66] 91195552 55 TTABVUE 2.

*Corp.*, 138 F.3d 277, 46 USPQ2d 1026, 1040 (7th Cir. 1998) (secondary meaning figures in the 30's, while they can be probative, are generally "marginal"); *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795, 217 USPQ 988, 1000, n. 10 (5th Cir. 1983) (low levels of association in a survey cannot be said to establish secondary meaning).

As more fully discussed in the "Genericness" section, there are many media references to the term "pretzel crisps," as a whole, in lower case, with no apparent reference at all to Defendant, in what would be understood to be a generic or category reference, including by business and industry publications. Furthermore, many references associate the term "pretzel crisps" with more than one source. Among survey respondents who had an opinion, more than half thought the product came from multiple sources. If we add half of the respondents who did not know or were unsure to the respective one company or more than one company groups of respondents, an approach advocated by Defendant's expert, then more than half of all respondents perceive the term as indicating more than one company. *See, e.g.*, *Textron, Inc. v. ITC*, 753 F.2d 1019, 224 USPQ 625, 627 (Fed. Cir. 1985) (secondary meaning is "an association in buyers' minds between the alleged mark and a single source of the product"); *see also Coca-Cola Co. v. Koke Co. of Am.*, 254 U.S. 143, 145-46 (1920) (secondary meaning "means a single thing coming from a single source"). Although Defendant certainly has invested heavily in advertising and had sales success, the ultimate test is whether its efforts were successful. *See* TMEP § 1212.06(b) ("The ultimate test in determining whether a designation has acquired

distinctiveness is applicant's success, rather than its efforts, in educating the public to associate the proposed mark with a single source."); *see also Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 188 USPQ 623, 636 (7th Cir. 1976) ("Advertising expenditures, of course, are a measure of the input by which a company attempts to establish a secondary meaning. At issue is the success of this effort. The chief inquiry is directed toward purchasers' attitudes toward a mark.") (citation omitted); *compare In re Bongrain Int'l (Am.) Corp.*, 894 F.2d 1316, 3 USPQ2d 1727, 1729 (Fed. Cir. 1990) (sales success could indicate consumer acceptance of the product).

Accordingly, based upon consideration of all of the evidence of record, we find that Defendant's evidence of acquired distinctiveness is inadequate and that Defendant has failed to establish that the applied-for mark has acquired distinctiveness within the meaning of Section 2(f).

**Decision**: The petition for cancellation of Registration No. 2980303 is granted on the ground that "PRETZEL CRISPS" used in connection with "pretzel crackers," is generic.

The opposition to Application No. 76700802 is sustained on the ground that "PRETZEL CRISPS" used in connection with "pretzel crackers," is generic. In the event of appeal, we find, in the alternative, that the requirements for registration under Section 2(f) have not been met.